# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| CRAIG WILLIAMS, as personal representative of the ESTATE OF TODD WILLIAMS, <br><br> Appellant, <br><br> v. <br><br> PEACEHEALTH; DR. TIMOTHY MANZO, <br><br> Respondents, <br><br> DR. MARTIN WATTERSON; SKAGIT COUNTY; CITY OF SEDRO-WOOLLEY; STEVEN BOSTON; CHRISTINA DEBRUM; and CHARLIE MARTIN, <br><br> Defendants. | No. 87702-0-I <br><br> DIVISION ONE <br><br> UNPUBLISHED OPINION |

BIRK, J. — In this appeal from an order granting summary judgment we are asked whether a reasonable juror could conclude that Dr. Timothy Manzo was grossly negligent in the care he provided to Todd Williams (Williams) in the hours before Williams's death. Because of the expert testimony provided by Dr. Richard Cummins, we answer yes, reverse the superior court's order granting summary judgment, and remand for further proceedings.

I

This appeal is from an order granting summary judgment, so we take the facts in the light most favorable to the nonmoving party, Craig Williams, personal

representative of the Estate of Todd Williams (collectively Estate), based on the evidence submitted on summary judgment.  Peterhans v. Univ. of Wash., 34 Wn. App. 2d 745, 747-48, 571 P.3d 322, review denied, 5 Wn.3d 1020, 578 P.3d 762 (2025).

On November 28, 2019, Todd Williams ingested an unknown quantity of his mother's prescription medication.  At 5:03 p.m., Williams was admitted to PeaceHealth's United General Medical Center (United General) in Sedro-Woolley.  Police officers brought Williams to United General for a "fit for jail evaluation," a practice where, as Dr. Manzo defines it, "police bring in a person who becomes a patient to determine if they are safe to go into police accompaniment or custody . . . to medically clear them . . . [which is] the common term that [United General] uses."[1]  United General Emergency Department (ED) staff consulted with poison control, and poison control recommended that Williams be monitored for a period of time following ingestion, which United General determined would end at 10:00 p.m. that night.

Williams was initially seen in his fit for jail evaluation by registered nurse (RN) Zak Thatcher.  In a note logged at 5:17 p.m., RN Thatcher wrote that Williams was "[r]ambling," did "not stay on topic," that he says he "wants a bad tooth pulled," "wants 'a whole body workup,' " "wants a test for esophageal cancer," and that he became irritated when asked about his prescription medications, which he believed RN Thatcher had been prescribing him.

---

[1] Williams's family called 911 after they found him ingesting medications from a medicine cabinet.  Police officers from the Skagit County Sheriff's Office arrested Williams for theft.

At 5:33 p.m., Dr. Martin Watterson ordered suicide precautions, cardiac monitoring, and lab tests for Williams. At 6:00 p.m., Dr. Watterson ordered seizure precautions for Williams. Dr. Watterson later evaluated Williams, and in his provider notes, logged at 6:17 p.m., wrote that Williams's family had found him consuming pills, "[a]pparently this was approximately 80 tablets of 0.5 mg Xanax, either Celexa or Viibryd about 10 tablets, long-acting propranolol 60 mg each also 10 tablets." Dr. Watterson noted that Williams's history was limited because Williams was tangential and agitated. In his psychiatric notes for Williams, Dr. Watterson wrote, "His affect is labile and inappropriate. His speech is delayed. He is agitated. Thought content is delusional. He expressed impulsivity and inappropriate judgment. He expresses no suicidal ideation. He expresses no suicidal plans." And for his substance use, Dr. Watterson wrote that Williams consumes "1/5 vodka daily." Dr. Watterson's initial diagnoses included "anxiety" and "panic disorder." Dr. Watterson noted for Williams, "[a]ltered mental status, unspecified altered mental status type," and "[d]rug overdose, undetermined intent, initial encounter."

Dr. Timothy Manzo arrived at the ED by 6:50 p.m., just ahead of the 7:00 p.m. shift change. With the shift change, responsibility for Williams's care transferred from RN Thatcher to RN Kerri Morton and from Dr. Watterson to Dr. Manzo. During Dr. Watterson's transition out, he had a conversation with Dr. Manzo about Williams and turned over all relevant materials related to his patient care.

At 7:36 p.m., RN Morton wrote a note that Williams was "attempting to leave [against medical advice]. [Police Department] called, an officer has been dispatched. Dr. Manzo speaking with [Williams.]" This was Dr. Manzo's first documented interaction with Williams. Sedro-Woolley police officers Bryan Hull and David Pierce arrived and spoke with Williams.

At 8:05 p.m., ED staff moved Williams to "Room 9." Because "Williams's behavior was very disruptive to the [ED] flow, and he would often come out of the room and ask the nurse questions and ask [Dr. Manzo] when he could leave," in the interest of keeping him in his room and maintaining the privacy of other patients, "a nurse suggested putting him into Room 9, which is a room that [staff] use to give patients more privacy, and [Williams] was agreeable to that." Dr. Manzo had to order restraints to move Williams to Room 9 because "[e]ven though he wasn't physically restrained at that time, it's considered a physical restraint to close that door. And he was agreeable to [them] closing that door." An order for restraints was required because the door for Room 9 locks from the outside. While in Room 9, Williams was able to knock on the door and ask to use the bathroom or get snacks.

After moving into Room 9, Officers Hull and Pierce went into the room with Williams, who "started to escalate" but after five minutes Williams "calmed down." At 9 p.m., the police officers stood outside Room 9 while Williams spat on the floor and yelled. Officer Hull reported that Williams was argumentative with staff and destructive to his room, tearing off bed sheets, ripping at his gown, punching the

4

door, window, and walls, and spitting chewing tobacco on the floor.[2] Officer Pierce reported that Williams had removed his hospital gown and was walking around in his underwear, going through mood swings, punching walls, and at times " 'was acting like a little kid.' "

At 9 p.m., Dr. Manzo began a provider note, which he signed at 9:49 p.m. In his "presentation narrative" he wrote,

> 48-year-old male who presents to the [ED] after suspected overdose. I was told by outgoing physician that family had taken pills out of his mouth. Time of ingestion was 2 PM. Patient has been in the [ED] since 5 PM. Poison control indicated he would need observation for 8 hours following ingestion. The patient is an unreliable historian and easily agitated when asking questions. He is unable to give any helpful information, states that he took 3 pills, at [sic] sometimes says that he took 4 pills. He is demanding for the blood test to prove that he did not overdose.

Dr. Manzo wrote that Williams "is agitated when approached and asking questions. He gives unreliable inconsistent answers." Dr. Manzo noted,

> At the start of my shift the patient had already been agitated, giving unreliable answers to staff "I am a cowboy[."] He began walking out of the [ED] and I implored him to stay longer. As he is unable to take care of himself at this point due to inconsistent answers, not able to reiterate our reasoning for having him stay in the [ED], and *I am worried with his slurred speech that he could walk out to the highway and become injured or get lost in the cold weather as it is freezing tonight.* Police Department were called as he was still wanting to leave. The patient called the police himself. The police department reason[ed] with him and stayed for over an hour in case [ED] staff needed additional help. He was placed in room 9 and the door was shut. He is occasionally knocking on the door, but appears medically

---

[2] Counsel for the Estate provided a declaration in which he attached several exhibits, which were considered by the court on the motion for summary judgment. The exhibits include excerpted deposition testimony from Officers Pierce and Hull. But the declaration does not include the police reports that Dr. Cummins, Craig's expert witness, appears to have relied on for his declaration. United General and Dr. Manzo did not object to the factual narrative in Dr. Cummins's declaration.

> stable. He has pulled out his IV and all cardiac monitoring. At this point as he is unable to take good care of himself, but likewise has good respiratory status he will remain in room 9 until clearing at 10 PM.
>
> Patient had follow-up EKG [electrocardiogram] at the end of the 8-hour mark which is normal without QT prolongation. He has remained asymptomatic. He is able to give me the date and the purpose of his being here. He denies suicidality and there is no report of suicidal statements. *He was offered to stay for social work mental health evaluation tomorrow and he declined, as he is not suicidal he is non-detainable.*

(Emphasis added.) For his final impression of Williams, Dr. Manzo wrote, "[a]ltered mental status, unspecified mental status type" and "[d]rug overdose, undetermined intent, initial encounter." Dr. Manzo described Williams prior to discharge as being "able to speak with [him] much more lucidly. He was able to describe the reason that he was brought to the ER. He was very anxious about being in the hospital and being around doctors and medical people. He did not want to be there." Dr. Manzo offered Williams the opportunity to stay overnight for an evaluation with a social worker the next day, but Williams declined. Dr. Manzo did not conduct a formal suicide screening with Williams.

In his discharge instructions, Dr. Manzo wrote,

> Todd, you came to our [ED] because there is a strong suspicion from your family members that you had overdosed on potentially lethal medications which were not your own.
> You have been observed for a total of 8 hours following suspected ingestion. At this point there are no signs of worsening of condition. We suggest you receive immediate mental health evaluation but you have declined.

Earlier, at 8:27 p.m., RN Morton spoke with Williams's nephew and she noted that Williams's "family will be able to pick [him] up at 10 [p.m.] when he is medically cleared." At 10:03 p.m., RN Morton noted that Williams "is medically cleared," and

6

that she had called Williams's nephew twice and left a message. She offered to let Williams stay in the waiting room until they heard from his nephew, but "[Williams] states he wants to leave. [He] departed from [ED] alongside PD."

Williams then left the ED with Officers Pierce and Hull. Dr. Manzo did not see Williams again after he departed the ED. Williams tried to reenter United General but according to Officer Pierce, staff told Williams "they were done with him unless he needed medical attention; that they didn't want him back in since he had been released." Williams then tried to walk into United General and Officers Pierce and Hull prevented him from reentering. Officer Pierce later saw Williams hitchhiking and told him to stay out of the road, to which Williams responded with an expletive and Officer Pierce continued on. At 10:56 p.m., Williams was walking on SR 20 when he was hit by three cars and killed.

In September 2021, Williams's brother Craig, on behalf of Williams's estate, brought claims against, among others, Dr. Manzo and United General alleging medical negligence. In September 2023, United General and Dr. Manzo moved for summary judgment. They argued that because the Estate asserted that they had acted negligently by not involuntarily holding Williams at United General, the involuntary treatment act's (ITA), chapter 71.05 RCW, bad faith or gross negligence standard applied and there was no evidence of bad faith or gross negligence. To oppose the motions, the Estate filed an expert declaration from Dr. Richard Cummins.[3] Dr. Cummins stated that Dr. Manzo was grossly negligent in

_____

[3] At summary judgment and on appeal, Dr. Manzo argues that Dr. Cummins's declaration is a "sham affidavit" and that we should not consider it. To support this position, Dr. Manzo argues that Dr. Cummins never used the words

7

discharging Williams because Williams was "experiencing a behavioral health crisis, rendering him gravely disabled and a danger to himself. When deciding to discharge or detain Mr. Williams, Dr. Manzo failed to exercise slight care in making that decision. That failure directly resulted in Mr. Williams walking onto SR 20."

The superior court found that "no reasonable juror could find that the [d]efendant, Dr. Timothy Manzo, did not provide at least 'slight care' to Todd Williams. The [c]ourt concludes that [p]laintiff has failed to demonstrate by substantial evidence that Dr. Manzo was grossly negligent." The superior court granted United General and Dr. Manzo's motions for summary judgment and dismissed the case with prejudice. The Estate timely appealed.

---

"gross negligence," "slight care," and others during his deposition, and when Dr. Cummins was asked if he had any other "standard of care opinions," he replied, "I don't think so." Dr. Manzo contends that Dr. Cummins opining about "gross negligence" and "slight care," among other terms not mentioned in his deposition, in his declaration tells a "diametrically different story from his deposition testimony" and that it cuts against "fundamental fairness."

Under the "sham affidavit rule," " '[w]hen a party has given clear answers to unambiguous [deposition] questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.' " Asphy v. State, 31 Wn. App. 2d 605, 620 n.5, 552 P.3d 325, (alterations in original) (internal quotation marks omitted) (quoting Taylor v. Bell, 185 Wn. App. 270, 294, 340 P.3d 951 (2014)), review denied, 3 Wn.3d 1033, 559 P.3d 1023 (2024). Dr. Cummins was not asked clear and unambiguous questions about "gross negligence," "slight care," or any of the other complaints raised by Dr. Manzo. Dr. Cummins's deposition testimony is broadly consistent with his declaration. He testified that Williams was gravely disabled, that Williams's postdischarge conduct was evidence of his continuing instability, that a "reasonably prudent physician [would] recognize that [Williams was] not a stable, normal person [who was] ready for discharge, and that Dr. Manzo should have detained Williams because he was having a behavioral health crisis and was gravely disabled. Dr. Cummins's deposition testimony is consistent with, and not contradictory to, his declaration. His declaration is not a sham affidavit.

II

The Estate relies on Dr. Cummins's deposition testimony and written declaration, in which he opined that Williams was displaying signs of a " 'classic behavioral health crisis' " and the " 'unequivocal pattern of an unstable and gravely disabled person.' "  In Dr. Cummins's expert opinion, Dr. Manzo was too focused on "medical clearance" for a potential overdose from the prescription medication, and on the risk of suicide, but faced with all of Williams's warning signs Dr. Manzo should have "detained [Williams] for a mental health evaluation and not discharged [him]."  (Emphasis omitted.)

Dr. Cummins's testimony and declaration raise a genuine issue of material fact as to whether Dr. Manzo's decision to discharge Williams was gross negligence.

A

We review a superior court's decision to grant summary judgment de novo. Harper v. State, 192 Wn.2d 328, 340, 429 P.3d 1071 (2018).  On review, we consider all facts and reasonable inferences from those facts in the light most favorable to the nonmoving party.  Id.  We affirm a grant of summary judgment when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Id.; CR 56(c).

B

The parties agree that the Estate must show that Dr. Manzo was grossly negligent.  The gross negligence standard applies because under the ITA Dr.

9

Manzo had limited immunity in his decision to discharge, and not instead detain, Williams.

RCW 71.05.050(2) gives hospital and emergency room staff the authority to detain persons who, "as a result of a behavioral health disorder," pose "an imminent likelihood of serious harm," or are "gravely disabled," so that staff may bring in a designated crisis responder to evaluate the person. Relevant here, one definition of likelihood of serious harm is a substantial risk that "[p]hysical harm will be inflicted by a person upon his or her own person, as evidenced by threats or attempts to commit suicide or inflict physical harm on oneself." RCW 71.05.020(37)(a)(i). There are two definitions, or prongs, which meet the definition of "gravely disabled," and here we are concerned only with prong (a), covering a person who, because of a behavioral health disorder, is "in danger of serious physical harm resulting from failure to provide for his or her essential human needs of health or safety." RCW 71.05.020(25).

"No officer of a public or private agency, nor the superintendent, professional person in charge, . . . or attending staff of any such agency" shall "be civilly or criminally liable for performing duties pursuant to [the ITA] *with regard to the decision of whether to* admit, discharge, release, administer antipsychotic medications, or *detain a person for evaluation and treatment*: PROVIDED, [t]hat such duties were performed *in good faith* and *without gross negligence*." RCW 71.05.120(1) (emphasis added). "An incomplete or even unreasonable assessment under [the ITA] does not necessarily rise to the level of gross negligence under RCW 71.05.120." Dalen v. St. John Med. Ctr., 8 Wn. App. 2d

10

49, 62, 436 P.3d 877 (2019). Because there is no allegation of bad faith, the Estate must show that Dr Manzo was grossly negligent.

Gross negligence is " 'negligence substantially and appreciably greater than ordinary negligence.' " Peterhans, 34 Wn. App. 2d at 752 (quoting Nist v. Tudor, 67 Wn.2d 322, 331, 407 P.2d 798 (1965)). " 'To survive summary judgment in a gross negligence case, a plaintiff must provide substantial evidence of *serious negligence*.' " Id. at 753 (quoting Harper, 192 Wn.2d at 345-46). The Peterhans standard describes the court's task when evaluating a summary judgment motion subject to the gross negligence standard: "[T]he first step when analyzing a claim of gross negligence on a motion for summary judgment is to 'specifically identify the relevant failure alleged by the plaintiff.' " Id. at 753 (quoting Harper 192 Wn.2d at 343). "The second step is to 'determine whether the plaintiff presented substantial evidence that the defendant failed to exercise slight care under the circumstances presented, considering both the relevant failure and, if applicable, any relevant actions that the defendant did take.' " Id. (quoting Harper 192 Wn.2d at 343).[4] As explained in Peterhans, the " 'absence of slight care' formulation is

---

[4] In Harper, the court discussed Nist, and the " 'frequently expressed statement that gross negligence means the failure to exercise slight care.' " Harper, 192 Wn.2d at 342 (quoting Nist, 67 Wn.2d at 324). The "failure to exercise slight care" does not mean " 'the total absence of care but care substantially or appreciably less than the quantum of care inhering in ordinary negligence.' " Id. (quoting Nist, 67 Wn.2d at 331). In determining the "degree of negligence," that is ordinary or serious, the court's analysis must focus on " 'the hazards of the situation confronting the actor.' " Id. at 344 (quoting Nist, 67 Wn.2d at 331). In Nist, for example, the plaintiff was a car passenger and the defendant a driver who slowed down, used a turn signal, and then turned left, colliding with oncoming traffic. Id at 343-44. That the driver slowed down and used a turn signal was not relevant evidence of slight care. Id. at 343. It showed slight care for risks from trailing cars, but the only actions relevant to the slight care inquiry was care for the

ultimately encompassed within the 'serious negligence' standard," id. at 753 n.2, and gross negligence can more succinctly be viewed as " 'negligence that is especially bad,' " id. (quoting RESTATEMENT (THIRD) OF TORTS § 2 (Am. Law Inst. 2010). Although breach is generally a question decided by the trier of fact, the court may decide it as a matter of law when reasonable minds could not differ. Id. at 753.

Therefore, the first inquiry is, "what does the Estate allege Dr. Manzo failed to do?" And the second inquiry is, "under the circumstances, looking at what Dr. Manzo did do and what the Estate alleges he should have done, did the Estate present substantial evidence of Dr. Manzo's serious negligence?"

1

In Dr. Cummins's opinion, Williams was "gravely disabled with a behavioral health disorder that rendered him a danger to himself," meaning he met the prong (a) definition of gravely disabled. See RCW 71.05.020(25)(a). Dr. Cummins's opinion is that Williams was "a man with disordered thinking, lack of decision-making capacity, and impulsive actions and thought. His behavior was labile. Though he intermittently conveyed the impression of normal cognitive capacity, he inevitably returned to grossly disturbed cognition." Dr. Cummins draws attention to Williams's "paranoid and delusional thoughts," his disregard for "environmental dangers posed by his lack of warm clothing and lack of safe transportation to suitable shelter." He opines that this was "the unequivocal pattern of an unstable

---

hazards of the situation confronting the driver, i.e., those related to oncoming traffic. Id. at 344.

and gravely disabled person whose cognitive and behavioral turmoil led directly to his death."

In support of his opinion that Williams was gravely disabled, Dr. Cummins notes several more facts. Williams consumed an unknown quantity of prescription medications. He was unable to clearly communicate to RN Thatcher exactly what or how many prescription medications he had consumed. There was evidence that Williams was "a fifth-a-day vodka drinker" and "may have been experiencing alcohol withdrawal." Dr. Watterson noted Williams's agitation, disordered thinking, delayed speech, delusional thought content, impulsivity, and inappropriate judgment. In the hours leading up to his discharge, Williams attempted to leave against medical advice, he was moved into a room that locked from the outside, he spat on the floor, yelled, punched the walls and door, ripped at the bedsheets, and according to Officer Pierce, Williams " 'was acting like a little kid' " who would " 'go through mood swings.' "

Dr. Cummins's opinion also referred to Dr. Manzo noting Williams was " 'unable to take care of himself,' " and him worrying that Williams " 'could walk out to the highway and become injured or get lost in the cold weather.' " And Dr. Manzo noted that Williams had " 'pulled out his IV and all cardiac monitoring." But by 9:49 p.m., Dr. Manzo concluded that Williams was medically stable because his EKG was normal, he "remained asymptomatic," and because he was able to give "the date and the purpose of his being there." As Dr. Manzo's notes reflected, Williams denied suicidality, and there were no reports of suicidal statements,

13

therefore "as he [was] not suicidal he [was] non-detainable." Williams was medically cleared by 10:03 p.m.

According to Dr. Cummins, Dr. Manzo was not negligent in medically clearing Williams for his potential overdose, and though Dr. Cummins was critical of Dr. Manzo's process for evaluating Williams's suicide risk, he said Dr. Manzo was not wrong to conclude Williams was not suicidal.[5] But once Dr. Manzo medically cleared Williams and ruled out suicide risk, "what needed to happen from a clinical judgment standpoint" was that Dr. Manzo "need[ed] to cross over to ask [himself] the question of '[w]hat is wrong with Mr. Williams?' " In Dr. Cummins's opinion, "a reasonably prudent emergency physician is going to conclude [Williams] is having a behavioral health crisis. He's gravely disordered. I cannot discharge him. I need to hold him for safety." Williams's "behavioral disorder posed a risk of self-harm" and "Dr. Manzo needed to place a hold-for-safety order for Mr. Williams rather than discharge him."

2

Considering whether the Estate presented substantial evidence of Dr. Manzo's serious negligence, we now move to the second step of the Peterhans standard, and ask "under the circumstances, looking at what Dr. Manzo did do and what the Estate alleges he should have done, did the Estate present substantial evidence of Dr. Manzo's serious negligence?" Here, the Estate does not allege

---

[5] Dr. Cummins stated in his deposition, "I think the whole issue of suicide evaluation on the part of Dr. Manzo speaks to his level of care which I think was [too] casual and dismissive of the possibility [of] suicide and how you evaluate, but I also agree that he was not suicidal."

any fault on Dr. Manzo's part in medically clearing Williams or in determining that Williams was not suicidal, so the focus of our substantial evidence inquiry concerns Dr. Manzo's serious negligence in considering, or not considering, whether Williams was gravely disabled and his decision not to detain Williams.

Dr. Manzo's notes emphasize Williams's expected medical clearance at 10 p.m. Dr. Manzo acknowledged "[i]n consideration of the patient's presentation today, differential diagnosis includes but is not limited to: [i]nfected overdose, psychiatric disorder," and in his final impression of Williams, "[a]ltered mental status, unspecified altered mental status type." But Dr. Manzo's discharge instructions focus on Williams's potential for overdose, concluding there were "no signs of worsening of condition." And although Dr. Manzo suggested that Williams receive an immediate mental health evaluation, as confirmed in his discharge instructions, he did not mandate it.

Dr. Manzo noted his concern that Williams was unable to care for himself and that Williams could wander onto the "highway and become injured or get lost in the cold weather." But, taken in the light most favorable to the Estate, Dr. Manzo's notes and deposition testimony suggest that he either did not consider detaining Williams for grave disability, or that he adopted a narrow view of what would qualify Williams as gravely disabled. In his note signed at 9:49 p.m., Dr. Manzo wrote, "[Williams] was offered to stay for social work mental health evaluation tomorrow and he declined, *as he is not suicidal he is non-detainable*." (Emphasis added.) Dr. Cummins suggests that this note indicates Dr. Manzo only

15

considered detaining Williams out of a concern for risk of suicide—that is likelihood of serious physical self-harm—rather than grave disability.

At his deposition, when Dr. Manzo was asked, "When you say Mr. Williams was nondetainable, what did you mean?" Dr. Manzo replied,

> It means that he was lucid enough to take care of his . . . activities of daily life, you know, like hygiene, and he was able to walk. He's able to tell me the time, the date, the purpose of his being there. He was not suicidal. If someone is suicidal, I have the obligation to at times keep them, if they don't want to stay, for [an] evaluation by a [designated crisis responder] or [a] mental health provider.

Asked about the findings he would need to order involuntary detention, Dr. Manzo said,

> Someone would have to demonstrate being gravely disabled and not being able to communicate effectively the purpose of their visit and the timing of their visit, and we ask them things like '[w]ho's the president?' and, you know, a variety of things to make sure that they're in contact with reality.

And asked to qualify that statement, Dr. Manzo said, "They don't necessarily need to be divorced from reality but if—if they have a set of features that make it clear that they're not safe to take care of themselves, then it's my obligation to detain them."

In Dr. Cummins's expert opinion, Williams was in the midst of a behavioral health crisis, Williams was gravely disabled and detainable under the ITA, and Dr. Manzo should have recognized Williams's grave disability and detained him. In Dr. Cummins's opinion, Dr. Manzo was too focused on Williams's medical clearance and his risk of self-harm. After medically clearing Williams and ruling out risk of suicide, Dr. Manzo needed to ask and answer the question, "[w]hat is

16

wrong with Mr. Williams?" The Estate's evidence meets the <u>Peterhans</u> standard. Taking the evidence in the light most favorable to the Estate, and drawing reasonable inferences in his favor, there is a genuine issue of material fact whether Dr. Manzo's care for Williams was grossly negligent.

III

United General was named in the complaint as being vicariously liable for the conduct of Dr. Manzo. Because we are reversing summary judgment against Dr. Manzo, we also reverse summary judgment against United General.

Reversed and remanded.

_Birk, J._
_____

WE CONCUR:

_Feldman, J._
_____      _____